UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

OMNI CONSULTING GROUP, INC.,

                Plaintiff,

                                          **DECISION AND ORDER**
                                                 01-CV-511A

       v.

MARINA CONSULTING, INC. and
PILGRIM'S PRIDE CORP.,

                Defendants.

---

I.    **INTRODUCTION**

Plaintiff Omni Consulting Group, Inc. commenced this action on July 19, 2001 against defendants Marina Consulting, Inc. ("Marina") and Pilgrim's Pride Corporation ("Pilgrim") alleging, *inter alia*, breach of contract, tortious interference with contractual relations, and civil conspiracy. On September 12, 2007, this Court granted partial summary judgment against Pilgrim, finding Pilgrim liable for breach of its contract with plaintiff. The case proceeded to a bench trial in June 2008 with respect to the following issues: damages regarding plaintiff's breach-of-contract claim against Pilgrim; liability and damages regarding plaintiff's breach-of-contract claim against Marina; and liability and damages regarding plaintiff's tortious-interference claim against Pilgrim.[1]

---

[1] Plaintiff informed the Court at the start of trial that it was not pursuing its civil-conspiracy claim any longer. (*See* Dkt. No. 195 at 5.)

Trial commenced on June 25, 2008. Marina failed to appear at trial. Plaintiff moved for default judgment against Marina, and the Court reserved decision. Following post-trial briefing and argument, the matter was deemed submitted in November 2008. However, on December 3, 2008, before this Court issued its bench trial ruling, Pilgrim filed a notice of suggestion of bankruptcy. The case was administratively closed on December 16, 2008, without prejudice to reopen when the bankruptcy concluded. Pilgrim remains in bankruptcy, but the Court reopened this case at the parties' request (*see* Dkt. No. 217) to determine what value, if any, would be assigned to plaintiff's claims for purposes of determining a liquidated amount in the bankruptcy proceedings.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, this Court now grants judgment in favor of plaintiff in the amount of $396,892.06 on its breach of contract claim against Pilgrim, grants default judgment in favor of plaintiff in the amount of $396,892.06 on its breach of contract claim against Marina, and grants judgment in favor of Pilgrim on plaintiff's tortious-interference claim.

## II. BACKGROUND AND FINDINGS OF FACT

Plaintiff was a New York corporation that provided recruiting services to clients such as Pilgrim. Under a contract between plaintiff and Pilgrim called a Technical Services Agreement ("TSA"), plaintiff agreed to provide Pilgrim with a computer consultant, and Pilgrim agreed to pay $175.00 per hour for the consultant's services, plus expenses. That consultant was Marina, whose sole

owner, operator, and employee was Robert Vance ("Vance").[2]  Among other provisions of the TSA, Section 7 prohibited Pilgrim from hiring any of plaintiff's consultants without prior written consent.  Appendix A to the TSA specified that the TSA renewed automatically each month, with Pilgrim required to provide a two-week notice of termination.  Under the TSA, which was signed on January 2, 1998, Marina performed services for Pilgrim from January 5, 1998 through October 30, 1998.

In a separate agreement between plaintiff and Marina called the Master Agreement, Marina agreed to provide plaintiff with personnel (*i.e.*, Vance) to serve plaintiff's clients.  The parties signed the Master Agreement on December 31, 1997.  Section 8 of the Master Agreement prohibited Marina from soliciting plaintiff's clients during the life of the contract plus 12 months after its termination.  Appendix A of the Master Agreement specified that the Master Agreement renewed automatically each month, with Marina required to provide a two-week notice of termination.  Plaintiff paid Marina $100.00 per hour worked, plus expenses.

Under the Master Agreement and the TSA, the relationship between plaintiff, Marina, and Pilgrim proceeded without incident until the fall of 1998.

---

[2] Bernard Nienhaus, III, a former Chief Financial Officer and Director for plaintiff, testified credibly about his general role in taking care of invoicing sent to Pilgrim, including hours and expenses that Vance submitted on a regular basis.  Nienhaus also testified credibly that plaintiff paid no recruitment fee when it hired Vance.

3

Before then, Marina/Vance had been submitting to plaintiff weekly timesheets for work performed for Pilgrim. Plaintiff, in turn, would bill Pilgrim accordingly. In the fall of 1998, though, Vance decided that he wanted to "break" Marina's Master Agreement with plaintiff to eliminate plaintiff as a middleman. Doing so would mean that Vance would collect a higher portion of the hourly fee that he billed to Pilgrim or to others. Vance communicated his intention to Pilgrim. Pilgrim never saw the Master Agreement but knew generally that Vance had contractual non-compete obligations to plaintiff, obligations that it understood generally to be common in the computer consulting industry. Accordingly, Pilgrim informed Vance that if, on his own initiative, "he had worked out something where he could directly work for us" (Dkt. No. 196 at 57) then Pilgrim would hire him. Pilgrim neither discussed Vance's intentions with plaintiff nor inquired with plaintiff about the exact terms of the Master Agreement.[3] Without giving any notice of termination to plaintiff, Vance informed Pilgrim that he had indeed "worked things out" with plaintiff and could proceed to direct relationship with Pilgrim. Vance quietly stopped submitting timesheets to plaintiff after October 1998.

Starting in November 1998, Vance was providing services directly for Pilgrim without plaintiff's knowledge or involvement, in violation of Section 7 of the

---

[3] The Court discounts the testimony of Charles Kennedy, a director of business applications and the Information Technologies Department at Pilgrim, to the extent that he tried to suggest that Pilgrim acted appropriately in taking a "hear no evil, see no evil" approach to Marina/Vance's relationship with plaintiff.

4

TSA. Under the agreement that Vance and Pilgrim entered, Pilgrim would pay Vance $125 per hour for his services. This new agreement created an incentive for each side: Vance would receive $25 per hour more than plaintiff was paying him initially, while Pilgrim reduced its expenses by $50 per hour by eliminating plaintiff. Vance contracted with Pilgrim from November 1998 to July 2000.

Plaintiff did not begin to realize that something went wrong in its relationship with Marina/Vance until the first week of November 1998 passed without a timesheet coming in from Vance. Joseph C. Bella, III ("Bella"), a former president and owner of plaintiff, called Pilgrim more than once in early November 1998 to reach Vance but could not connect with him.[4] On November 16, 1998, Pilgrim finally called Bella and informed him that Vance no longer worked there and that Pilgrim no longer needed him. (*But see* Pl. Ex. 7 (including invoices that Vance submitted to Pilgrim for time worked in November 1998).) Pilgrim's call was equivalent to a notice of termination or completion from Vance, meaning that the TSA and Master Agreement were in effect through November 30, 1998 and that the 12-month non-solicitation period in the Master Agreement began on November 30, 1998 and ended on November 30, 1999. The parties have stipulated (*see* Dkt. No. 177) that Vance worked for Pilgrim from November 1998 to November 1999 as follows:

---

[4] The Court found Bella's testimony about the events of early November 1998 credible and discounts any alternative narrative from Vance or Pilgrim accordingly.

5

| YEAR | MONTH | HOURS |
|---|---|---|
| 1998 | November | 158 |
| 1998 | December | 232 |
| 1999 | January | 238 |
| 1999 | February | 192 |
| 1999 | March | 212 |
| 1999 | April | 216 |
| 1999 | May | 262 |
| 1999 | June | 126 |
| 1999 | July | 181 |
| 1999 | August | 272 |
| 1999 | September | 242 |
| 1999 | October | 241 |
| 1999 | November | 284 |
|  | TOTAL: | 2,856 |

### III. DISCUSSION

#### A. *Deposition Testimony*

As a preliminary matter, the Court will address the pending motion by Pilgrim to incorporate into the trial record the deposition testimony of three individuals, Michele and Joseph Bella, Jr., and John Gabriel. Pilgrim seeks the incorporation of the deposition testimony to support its contention that circumstantial evidence exists indicating that plaintiff paid a recruiting fee to secure Vance's services. Pilgrim wants that circumstantial evidence in the record because it believes that the payment of a recruiting fee affects the profitability of

6

the two contracts in question in this case. Plaintiff opposes the incorporation of the deposition testimony into the trial record for several reasons, including relevance and cumulative testimony.

"A party may use for any purpose the deposition of a witness, whether or not a party, if the court finds . . . that the party offering the deposition could not procure the witness's attendance by subpoena." Fed. R. Evid. 32(a)(4)(D). That said, "an objection may be made at a hearing or trial to the admission of any deposition testimony that would be inadmissible if the witness were present and testifying." Fed. R. Evid. 32(b). At trial, plaintiff preserved its objections to the incorporation of the deposition testimony. The Court ruled at trial that it considered the proposed deposition testimony irrelevant but that Pilgrim could place it into the record for purposes of any possible appeal. (*See* Dkt. No. 197 at 183.) Since then, the Court has decided that, putting plaintiff's objections aside for a moment, it will assign little weight to the deposition testimony because it has credited other evidence that no recruiting fee was paid. Plaintiff's objections thus are moot from a practical perspective, but the Court nonetheless grants the pending motion for the sake of a complete trial record.

    **B.**    ***Tortious Interference Claim as Against Pilgrim***

Next, the Court will address plaintiff's tortious-interference claim against Pilgrim. "Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the

contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001) (citation omitted). The evidence at trial established the first, second, and fourth elements. The parties never disputed the validity of the Master Agreement between plaintiff and Marina/Vance, which was enforceable through November 30, 1998. Pilgrim may not have seen the Master Agreement or known of its particular details, but it knew that Vance had a contractual relationship (via Marina) with plaintiff. The very fact that Pilgrim knew that Vance needed to "break" a contract or otherwise to "work things out" with plaintiff confirms Pilgrim's knowledge. Although the parties would dispute the exact calculations, there is no reasonable dispute here that plaintiff did not receive any payment for any of Vance's services to Pilgrim during a 13-month period beginning in November 1998 and ending on November 30, 1999.

Nonetheless, plaintiff has not established the third element of its tortious-interference claim. "Intentional procurement of a breach is an essential element of the tort of interference with contractual relations. A plaintiff must allege that there would not have been a breach but for the activities of defendants." *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990) (internal quotation marks and citations omitted). Here, Vance came up with the idea of breaking the Master Agreement on his own. He told Pilgrim, without any prompting, that he would "work things out" with plaintiff to allow for a direct

relationship with Pilgrim. The very fact that Vance had to tell Pilgrim that he would "work things out" implies that Pilgrim hesitated to hire Marina/Vance. Pilgrim thus never suggested or encouraged any contractual breaches; it merely took advantage of an idea that Vance carried forward on his own. *Cf. Michele Pommier Models, Inc. v. Men Women Ny Model Mgmt., Inc.*, 173 F.3d 845, No. 98-9079, 1999 WL 236895, at *1 (2d Cir. Apr. 15, 1999) (table case) ("The evidence overwhelmingly demonstrated that Benitez intended to break her contract with Pommier several months prior to her negotiations with WMM, and that it was she who sought out WMM for the purpose of breaching her contract with Pommier."). Under these circumstances, any suggestion that Pilgrim lured Vance away from a relationship that he would have continued is unsupported. The Court thus finds that plaintiff has not established tortious interference by Pilgrim by a preponderance of the evidence.

### C. *Damages as Against Both Defendants for Breach of Contract*

Having granted plaintiff partial summary judgment against Pilgrim for breach of the TSA and default judgment against Marina for breach of the Master Agreement, the Court now will assess the damages that those breaches caused. "New York law requires that a plaintiff prove with a reasonable degree of certainty that any claimed loss of profits was caused by the defendant's breach." *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 728 (2d Cir. 1992) (citations omitted). More specifically, "a plaintiff who proves a breach of contract may recover lost

profits contract[ed] only by showing: (1) that the damages were caused by the defendant's breach; (2) that the lost-profit damages are capable of proof with reasonable certainty; and (3) that such damages were fairly within the contemplation of the parties to the contract at the time it was made." *Spherenomics Global Contact Ctrs. v. vCustomer Corp.*, 427 F. Supp. 2d 236, 251 (E.D.N.Y. 2006) (internal quotation marks and citations omitted). Here, plaintiff has shown sufficient evidence that it would not have incurred damages but for 1) Vance's failure to provide an appropriate two-week notice of termination; and 2) Vance's decision to start a direct relationship with one of plaintiff's clients fewer than 12 months after terminating its relationship with plaintiff. The lost profits are capable of proof with reasonable certainty because the numbers to be multiplied are known. During the 13-month period running from the beginning of November 1998 to the end of November 1999, each of Vance's hours with Pilgrim fell under the contracts in question and would have generated a $75 profit for plaintiff. The Court finds insufficient evidence that plaintiff incurred overhead costs solely because of its relationship with Vance. The evidence shows that the parties contemplated the arrangement that would have given plaintiff the $75 per hour profit. As noted in the table above, Vance worked a total of 2,856 hours during the 13-month time in question. Multiplying those hours by the $75-per-hour profit margin yields a total of $214,200. Under

the circumstances, the Court finds that plaintiff has incurred pre-interest damages in the amount of $214,200 as a result of defendants' conduct.

### D. *Pre-judgment Interest*

Plaintiff has requested pre-judgment interest in connection with any damages award that the Court granted. Courts in this Circuit have "consistently held that, in diversity cases commenced under New York law, the source of the right to prejudgment interest is [New York's CPLR 5001]." *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1101 (2d Cir. 1992) (citation omitted); *see also* N.Y. CPLR 5004 ("Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute."); *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998) ("New York courts have held that in a breach of contract action of this sort prejudgment interest must be calculated on a simple interest basis at the statutory rate of nine percent.") (citation omitted).[5] The procedure for computing interest under CPLR Article 50 is straightforward. "Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various

---

[5] Plaintiff insists that the 1.5% monthly simple interest rate from Section 4 of the TSA should apply to any damages award. (*See* Pl. Exs. 1A at 1, 1B at 1.) That rate, however, applies only to late invoices. The damages award has no relation to late invoices that plaintiff generated, and the TSA did not contemplate interest rates to be applied in the event of breaching conduct. Accordingly, the Court will not use the interest rate specified in the TSA.

times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." CPLR 5001(b). "Accordingly, where damages are incurred at various times after the cause of action accrues, section 5001 grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest." *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 512 (2d Cir. 1994) (citation omitted). Here, Vance submitted his hours to plaintiff—and later to Pilgrim—on a weekly basis. A comprehensive interest calculation thus would require numerous separate calculations, but the Court finds that one calculation from an intermediate date will suffice. Noting that the period of the breach—November 1, 1998 through November 30, 1999—ran a total of 395 days, the Court will cut that period in half and use June 16, 1999 as a reasonable intermediate date from which simple interest began to accrue. Also, and as a matter of fairness, the Court will stop the accrual of interest at December 3, 2008, when Pilgrim filed its notice of suggestion of bankruptcy (Dkt. No. 213).

Accordingly, the Court computes interest as follows. Simple interest equals the principal times the periodic interest rate times the number of periods. The principal here is the damages award of $214,200. The periodic interest rate is the 9% annual rate (0.09) divided by 365 to arrive at a daily rate of 0.02466% (0.0002466). The number of periods is 3,459, reflecting the 3,459 days (9 years, 5 months, 18 days) that passed from June 16, 1999 through December 3, 2008.

The total pre-judgment interest to be awarded thus equals

$$\$214{,}200 \times 0.0002466 \times 3{,}459 = \mathbf{\$182{,}692.06}$$

and the total award due to plaintiff equals

$$\$214{,}200 + \$182{,}692.06 = \underline{\mathbf{\$396{,}892.06}}.$$

### E. *Punitive Damages*

Since the Court has not found Pilgrim liable on plaintiff's tortious-interference claim, plaintiff's request for punitive damages requires only a brief discussion. Plaintiff seeks punitive damages against Pilgrim to punish Pilgrim for its supposedly blatant disregard of plaintiff's rights under the Master Agreement. Pilgrim opposes any assessment of punitive damages because 1) it notes, correctly, that such damages are not available when liability relates only to a breach of contract; and 2) it contends that insufficient evidence exists to support plaintiff's tortious-interference claim, which would open the door to a consideration of punitive damages.

The New York Court of Appeals has set forth "the pleading elements required to state a claim for punitive damages as an additional and exemplary remedy when the claim arises from a breach of contract. They are: (1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of the egregious nature set forth in *Walker v. Sheldon*, 10

N.Y.2d 401, 404-405, 223 N.Y.S.2d 488 [(1961)], *supra*;[6] (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally." *N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 767 (N.Y. Ct. App. 1995) (citation omitted).

Here, plaintiff has satisfied only the third element of a claim for punitive damages. Pilgrim's breaching conduct was indeed directed to plaintiff since Pilgrim intended to spend less money dealing with Vance directly then it was spending under its relationship with plaintiff. That said, plaintiff has not established its tortious-interference claim against Pilgrim. Pilgrim's conduct constituted one act of one recruitment of one person affiliated with plaintiff. Pilgrim's conduct did not fit into any kind of pattern; did not aim at the public generally or at anyone other than plaintiff; did not have the effect of intimidating plaintiff such that punitive damages would induce victims like plaintiff to come forward; and generally did not rise to a level that would justify such strong descriptions as "evil" and "reprehensible." Pilgrim's breach more closely resembles a business decision to attempt to exploit a breach that Vance already

---

[6] "Punitive or exemplary damages have been allowed in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future. Moreover, the possibility of an award of such damages may not infrequently induce the victim, otherwise unwilling to proceed because of the attendant trouble and expense, to take action against the wrongdoer." *Walker v. Sheldon*, 179 N.E.2d 497, 498 (N.Y. Ct. App. 1961) (citations omitted).

contemplated. Plaintiff thus has failed to establish its claim for punitive damages. The Court, accordingly, denies plaintiff's request for punitive damages.

**IV.     CONCLUSION**

For all of the foregoing reasons, the Court orders as follows:

1) The Court grants plaintiff's trial motion for default judgment against Marina with respect to its claim for breach of contract and awards $396,892.06 in damages. The Clerk of the Court shall enter default judgment accordingly.

2) The Court grants the pending motion to designate deposition testimony (Dkt. No. 219).

3) The Court finds that plaintiff has not established, by a preponderance of the evidence, its claim of tortious interference with contractual relations against defendant Pilgrim's Pride Corporation.

4) As damages for the breach-of-contract claim against defendant Pilgrim's Pride Corporation, the Court awards plaintiff a sum in the amount of $214,200 plus $182,692.06 in interest for a grand total of $396,892.06. The Court does not award plaintiff any punitive damages.

5) The parties shall have 14 days from entry of judgment to commence any proceedings under FRCP 54(d)(2).

SO ORDERED.

*s/ Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: January 7, 2011